FILED

FEB 1 3 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

NO. CR. S-99-0433 WBS

            Plaintiff,

    v.                          MEMORANDUM AND ORDER RE:
                                DEFENDANT JOHN THAT LUONG'S
                                MOTION TO DISMISS BASED ON
                                SELECTION OF TRIAL JURY

JOHN THAT LUONG, et. al.

            Defendants.

----oo0oo----

Defendant John That Luong is one of seven defendants named in the indictment in this case.  Luong now moves to dismiss his indictment, or in the alternative, for a stay of proceedings, on the grounds that the racial composition of the jury wheel from which his trial jury is to be selected violates the Jury Selection and Service Act of 1968 and the Equal Protection Clause ("JSSA").[1]

_____

[1]    Co-defendants Minh Huynh and Son Van Nguyen have joined formally in this motion.  The court further understands that all other defendants with the exception of Bao Lu, who apparently for tactical reasons related to his speedy trial and severance motions has expressly declined to join in this and other pretrial

1

1   I.    Jury Selection and Service Act

2           Luong has presented a declaration from demographer John
3   R. Weeks stating that African-Americans, Hispanics, and "all
4   minority groups combined" are underrepresented in the 2002 jury
5   wheel for the Sacramento division of the Eastern District of
6   California.  (Weeks Decl. ¶ 5).  Based on this declaration, Luong
7   alleges violations of the JSSA.

8         A.    28 U.S.C. § 1861

9           Under 28 U.S.C. § 1861, "all litigants in Federal
10  courts entitled to trial by jury shall have the right to grand
11  and petit juries selected at random from a fair cross section of
12  the community in the district or division wherein the court
13  convenes."  The test for a constitutionally selected jury is the
14  same whether challenged under the Sixth Amendment or under the
15  JSSA.   United States v. Sanchez-Lopez, 879 F.2d 541, 546-47 (9th
16  Cir. 1989).   In Duren v. Missouri, 439 U.S. 357 (1979), the
17  Supreme Court articulated a three-part test for determining the
18  constitutionality of jury selection under the Sixth Amendment.

19          [T]o establish a prima facie violation of the fair
            cross-section requirement, the defendant must show (1)
20          that the group alleged to be excluded is a
            "distinctive" group in the community; (2) that the
21          representation of this group in venires from which
            juries are selected is not fair and reasonable in
22          relation to the number of such persons in the
            community; and (3) that this underrepresentation is due
23          to systematic exclusion of the group in the jury
            selection process.
24

25  Id. at 365.

26  ///

27  _____

28  motions, join informally in the motion.

                            2

1

1. "Distinctive" Group

2    To show that a group is "distinctive" under the first
3 prong of the <u>Duren</u> test, the defendant must establish "(1) that
4 the group is defined and limited by some factor (i.e., that the
5 group has a definite composition such as by race or sex), (2)
6 that a common thread or basic similarity in attitude, ideas, or
7 experience runs through the group, and (3) that there is a
8 community of interest among members of the group such that the
9 group's interest cannot be adequately represented if the group is
10 excluded from the jury selection process." <u>United States v.</u>
11 <u>Fletcher</u>, 965 F.2d 781, 782 (9th Cir. 1992).

12    Here, Luong alleges that the 2002 jury wheel
13 underrepresents African-Americans, Hispanics, and a group
14 consisting of "all minority groups combined." (Def.'s Mot. at
15 5). There is no question that African-Americans and Hispanics
16 are cognizable "distinctive" groups under <u>Duren</u>. <u>See</u> <u>United</u>
17 <u>States v. Cannady</u>, 54 F.3d 544, 547 (9th Cir. 1995); <u>United</u>
18 <u>States v. Suttiswad</u>, 696 F.2d 645, 648 (9th Cir. 1982). However,
19 the Ninth Circuit has rejected the theory that all non-white
20 groups can be combined to form a single "distinctive" group for
21 the purpose of a jury selection challenge. As the court reasoned
22 in <u>Suttiswad</u>:

23   Defendant suggests that this Court should "add up" all
  of the separate figures of minority underrepresentation
24   in order to arrive at one figure for
  underrepresentation of "non-whites" . . . . No
25   authority is presented for the argument that "non-
  whites" should be recognized as a separate "ethnic
26   group" for this purpose. . . . Any group which might
  casually be referred to as "non-whites" would have no
27   internal cohesion, nor would it be viewed as an
  identifiable class by the general population.
28   Certainly the members of such group would have "diverse

3

1  attitudes and characteristics which would defy
   classification."
2

3  Suttiswad, 696 F.3d at 649 (quoting United States v. Kleifgen,
4  557 F.2d 1293, 1297 (9th Cir. 1977)).  Accordingly, Luong has
5  established only African-Americans and Hispanics as "distinctive"
6  groups within the meaning of the Duren test.

7              2.    "Substantial Underrepresentation"

8              In order to meet the second prong of the Duren test,
9  "[o]ne claiming underrepresentation of a distinctive group must
10 . . . present data showing that the percentage of persons in that
11 group in the jury wheel is significantly lower than the
12 percentage eligible to serve on juries."  United States v.
13 Artero, 121 F.3d 1256, 1262 (9th Cir. 1997); see United States
14 v. Esquivel, 88 F.3d 722, 726-27 (9th Cir. 1996).  In evaluating
15 such data, the Ninth Circuit relies on "absolute disparity"
16 statistics, calculated by taking the percentage of the group at
17 issue in the total jury-eligible population and subtracting from
18 it the percentage of that group that is represented on the master
19 jury wheel.  See Artero, 121 F.3d at 1260-1262; Esquivel, 88 F.3d
20 at 727.  The Ninth Circuit has "consistently held that absolute
21 disparities below 7.7 percent are insubstantial and
22 constitutionally permissible."  Cannady, 54 F.3d at 548; Sanchez-
23 Lopez, 879 F.2d at 548; Suttiswad, 696 F.2d at 648.

24             According to Weeks' study of the 2002 jury wheel,
25 Hispanics represent 10.3 percent of the jury-eligible population
26 in this division and 7.1 percent of the jury pool, thus producing
27 an absolute disparity of 3.2 percent.  (Weeks Supp. Decl.,
28 Attachment A).  Weeks also determined that African-Americans

                              4

1  represent 6.5 percent of the jury-eligible population in this
2  division and 3.5 percent of the jury pool, thus producing an
3  absolute disparity of 3.0 percent.  (Id.).

4          Luong concedes, as he must, that the absolute disparity
5  figures produced by his expert witness fall below the 7.7 percent
6  threshold that this circuit has held to be "insubstantial and
7  constitutionally permissible."  Cannady, 54 F.3d at 548.  Luong,
8  however, urges the court to consider a comparative disparity
9  analysis, calculated by "divid[ing] the absolute disparity
10 percentage by the percentage of the distinctive group in the
11 total population."  Thomas v. Borg, 159 F.3d 1147, 1150 (9th Cir.
12 1998).[2]  Notwithstanding Luong's insistence that comparative
13 disparity analysis is "a necessary counterweight" to absolute
14 disparity analysis (Def.'s Mot. at 5), "the comparative disparity
15 test is strongly disfavored in the Ninth Circuit on the grounds
16 that it exaggerates the effect of any deviation."  Borg, 159 F.3d
17 at 1151; see also Sanchez-Lopez, 879 F.2d at 548 ("We have
18 consistently favored an absolute disparity analysis and have
19 rejected a comparative disparity analysis.").

20          3.  "Systematic Exclusion"

21         The court's application of the Duren test ends with
22 Luong's concession that his expert's absolute disparity figures
23 fall within the constitutional limits set by this circuit.
24 However, even if Luong had met his burden of showing substantial
25 underrepresentation, he would still have to show that it is due

26
_____
27     [2]    Under a comparative disparity analysis, the 2002 jury
       wheel underrepresents African-Americans by 47 percent, and
28 Hispanics by 31 percent.  (Weeks Supp. Decl., Attachment A).

                                5

1  to systematic exclusion of African Americans or Hispanics in the
2  jury selection process.  He has not done so.

3          As the Fourth Circuit noted in Truesdale v. Moore, 142
4  F.3d 749, 755 (4th Cir. 1998), more than substantial
5  underrepresentation of a distinctive group is required to
6  establish a violation of the "fair cross-section" guarantee of
7  the Sixth Amendment.  Citing United States v. Cecil, 836 F.2d
8  1431, 1445 (4th Cir. 1998)(en banc), the Fourth Circuit held,
9  "The use of voter registration lists 'has been consistently
10 upheld against both statutory and constitutional challenges,
11 unless the voter list in question had been compiled in a
12 discriminatory manner."  See also United States v. Ireland, 62
13 F.3d 227 (8th Cir. 1995)(evidence of underrepresentation without
14 more failed to establish that Native Americans were
15 systematically excluded); Schanbarger v. Macy, 77 F.3d 1424 (2nd
16 Cir. 1996)(absent positive evidence that some groups had been
17 hindered in attempting to register to vote, a jury venire drawn
18 from voter registrations lists did not violate the fair cross-
19 section requirement of the Sixth Amendment); United States v.
20 Ashley, 54 F.3d 311, 314 (7th Cir. 1995); Ford v. Seabold, 841
21 F.2d 677, 685 (6th Cir. 1988).

22         Despite being given unlimited authority by the court,
23 at taxpayer expense, to employ whatever experts, gather whatever
24 data, conduct whatever investigation, and spend whatever time and
25 money might be necessary, Luong has come forward with no evidence
26 to suggest that either African Americans or Hispanics are
27 hindered in attempting to register to vote, discriminated
28 against, barred from participation in jury venires, or otherwise

6

1  systematically excluded from the jury selection process in this
2  district.

3     B.    28 U.S.C. § 1863(b)(2)

4     Luong directs the court's attention to Weeks' opinion
5  that minority underrepresentation in the 2002 jury wheel "is the
6  direct result of the way in which the jury pool is created, using
7  only lists of registered voters without supplementation from
8  other sources which would more fairly represent a cross-section
9  of the jury-eligible population in the District." (Def.'s Mot.
10  at 3).

11     Specifically, Weeks volunteers the recommendation that
12  the court "replace its current system of using only the file of
13  registered voters and, instead, supplement that list by merging
14  it with the lists from the Department of Motor Vehicles." (Weeks
15  Supp. Decl. ¶ 20).  The only evidence he offers to suggest that
16  such a modification to the court's plan would increase the
17  representation of minorities is the fact that he has only twice
18  found a statistically significant disparity after a court merged
19  its list of registered voters with the Department of Motor
20  Vehicles ("DMV") lists, and those were both in Los Angeles
21  County.  The main fallacy with that reasoning is that he does not
22  tell us how many times, if ever, he has found that there was not
23  a statistically significant disparity.  Moreover, as discussed
24  below, by standards set forth in Ninth Circuit case law there is
25  no legally significant disparity here.

26     The reliability of Professor Weeks' "advocacy research"
27  has been called into question by the Ninth Circuit in the past.
28  See Artero, 121 F.3d at 1262.  His analysis here is as

7

ineffective as it has been in the past.

At the outset, this court notes that it has an affirmative and independent obligation under 28 U.S.C. § 1863(a) to assure that its jury plan complies fully with the Constitution and all applicable provisions of Title 28 of the United States Code. In attending to that obligation the court has many times heard and considered the suggestion that its list of registered voters be merged with lists from the DMV. The suggestion is most typically made by those who represent defendants in criminal cases. It is generally agreed by all concerned that such a process involves additional challenges in avoiding duplicate listings and assuring that non-citizens, felons, and other non-qualified individuals from the DMV lists are culled from the merged list. It is generally acknowledged, however, that at significantly increased expense and administrative burden those problems can be resolved. See United States v. Coronell-Leon, 973 F. Supp. 1094 (D. Neb. 1997). It is also generally acknowledged that creation of such a merged list would ultimately result in a larger jury pool--i.e., include more people.

However, it is not at all clear that such a merged list would increase the representation of African Americans, Hispanics, or any other minorities in the jury venire. To the contrary, some research has indicated that supplementation of the jury list by such a method may decrease minority representation. See 5 Crim. Proc. § 22.2(a)(2d ed.); Bueker, Note, "Jury Source Lists: Does Supplementation Really Work?" 82 Cornell Law Review 390 (1977).

What is clear to this court is that supplementation of

8

1  the list of registered voters with the names of persons who for
2  whatever reasons have chosen not to register to vote will
3  increase the percentage of apathetic individuals in the venire.
4  The same pool is used to select the jurors who will hear complex
5  civil cases as is used to select those who will hear criminal
6  cases.  While apathetic jurors may be more desirable from the
7  defense side in criminal cases, it would be a mistake to assume
8  that they will make better jurors for any of the parties in other
9  cases.  It would also be a mistake to assume that forcing jury
10 service upon persons who do not have enough public spirit even to
11 register to vote would promote the policy that all citizens be
12 afforded the opportunity to be considered for jury service.  Any
13 citizen wishing to be considered for jury service need only
14 register to vote, a very simple task, especially compared with
15 the process of registering with the DMV for a driver's licence.

16      Rather than supplement its list of jurors with names
17 from the DMV, this court has concluded that the better way to
18 enlarge the jury pool is an outreach program to encourage all
19 qualified individuals, not just certain minority groups, to
20 exercise their rights as citizens to register to vote.  That is
21 the course of action this court has elected to pursue, long
22 before Luong's motion was made.

23      28 U.S.C. § 1863(b)(2) indeed requires that a plan for
24 random jury selection "shall prescribe some other source or
25 sources of names by some other source or sources of names in
26 addition to voter lists where necessary to foster and policy and
27 protect the rights secured by sections 1861 and 1862 of this
28 title."  By its terms, § 1863(b) requires the use of other

9

1  sources only when necessary to foster the policies and protect
2  the rights secured by sections 1861 and 1862.[3]  The question
3  therefore becomes whether supplementation of the registered
4  voters lists from other sources is necessary to foster those
5  policies and protect those rights.

6          There is clear statutory authority for the exclusive
7  use of voter registration lists in compiling the juror names.  In
8  the JSSA, "Congress designated voter registration lists (or lists
9  of actual voters) as the main source for selecting potential
10  jurors."  Esquivel, 88 F.3d at 725; see also United States v.
11  Brady, 579 F.2d 1121, 1134 (9th Cir. 1978) ("Voter lists were
12  chosen because they provide the best available residential lists
13  for a community and are constantly updated.").  Further, the
14  Ninth Circuit has found that Congress had specifically rejected
15  the notion that juror selection from voter registration lists
16  discriminates against groups whose members register to vote in
17  lower proportion than the rest of the population.  Brady, 579
18  F.2d at 1121-31.  As expressed by the House Judiciary Committee:

19          In a sense the use of voter lists as the basic source
20          of juror names discriminates against those who have the
               requisite qualifications for jury service but who do
21          not register or vote.  This is not unfair, however,
               because anyone with minimal qualifications -
22          qualifications that are relevant to jury service - can
               cause his name to be placed on the lists simply by
23          registering or voting.  No economic or social
               characteristics prevent one who wants to be considered
24          for jury service from having his name placed in the

25  ────────────
       [3]     Section 1861 sets forth the policies that all litigants
26  shall have the right to juries selected at random from a fair
     cross section of the community and that all citizens shall have
27  the opportunity to be considered for jury service.  Section 1862
     prohibits exclusion of jurors on account of race, color,
28  religion, sex, national origin, or economic status.

1      pool from which jurors are selected.
2  1968 U.S. Code Cong. & Admin. News, p. 1795.

3        While the JSSA does require the supplementation of
4  voter lists when "necessary" to further the goals of the JSSA,
5  the Ninth Circuit has found that "[the Act] and its legislative
6  history clearly contemplate that the use of sources other than
7  voter lists will be the exception rather than the rule."  United
8  States v. Ross, 468 F.2d 1213, 1216 (9th Cir. 1972).  In order to
9  prove that supplementation is necessary, the defendant must show
10 that use of the voter registration lists "resulted in a
11 substantial underrepresentation in the jury pool of a cognizable
12 group in the community."  Kleifgen, 557 F.2d at 1296; see also
13 Brady, 579 F.2d at 1131 ("The legislative history indicates that
14 use of supplemental sources should be used only when the voter
15 lists deviate substantially from the makeup of the local
16 community.").

17       As discussed, Luong has conceded that the absolute
18 disparity between the jury eligible Hispanic population and the
19 2002 jury wheel is 3.2 percent, while the absolute disparity for
20 African-Americans is 3.0 percent.  These numbers fall below the
21 7.7 percent threshold found to be constitutionally permissible.
22 Cannady, 54 F.3d at 548.  Accordingly, the use of voter
23 registration lists as the sole source for selecting jurors in
24 this district does not violate 28 U.S.C. § 1863(b)(2).
25 II.  Equal Protection
26       In order to establish a prima facie case that a jury
27 selection procedure violates equal protection, the defendant
28 must: (1) establish that the defendant belongs to a group that is

                                11

1   "a recognizable, distinct class, singled out for different
2   treatment under the laws, as written or as applied;" (2) prove
3   the degree of underrepresentation "by comparing the proportion of
4   the group in the total population to the proportion called to
5   serve as grand jurors, over a significant period of time;" and
6   (3) show discriminatory intent.  Esquivel, 88 F.3d at 725 (citing
7   Castaneda v. Partida, 430 U.S. 482, 494 (1977)).

8            Here, Luong is clearly unable to make out a prima facie
9   equal protection violation.  First, Luong, who along with his co-
10  defendants is of Asian descent, does not allege that the jury
11  selection procedure has resulted in the "underrepresentation of
12  the race or identifiable group to which he belongs."  Castaneda,
13  430 U.S. at 494.  Rather, Luong alleges the underrepresentation
14  of African-Americans and Hispanics, groups to which Luong and his
15  co-defendants have not claimed membership.  Even if Luong were
16  either African-American or Hispanic, he has provided no evidence,
17  or even argued, that these groups have been singled out for
18  different treatment under the jury selection laws of this
19  division.

20           Second, Luong has failed to establish "the most crucial
21  factor in an equal protection case" - discriminatory intent.
22  Esquivel, 88 F.3d at 727.  The Supreme Court has found
23  discriminatory intent in selection procedures that are
24  "susceptible of abuse or [are] not racially neutral."  Id.
25  (citing Castaneda, 430 U.S. at 494).  The Supreme Court has found
26  opportunity for abuse in juror selections systems that hinge on
27  the subjective judgment of juror commissioners.  See, e.g.,
28  Castaneda, 430 U.S. at 494 (finding prima facie equal protection

                                    12

1 │ violation in a selection system wherein jury commissioners
2 │ personally select citizens from the community to be members of
3 │ the jury pool); <u>Alexander v. Louisana</u>, 405 U.S. at 628 (finding
4 │ opportunity for abuse in jury selection system wherein jury
5 │ commissioners personally "culled" out approximately 5,000 of
6 │ 7,374 questionnaires which contained racial designations).

7 │       Nothing has been presented which demonstrates or even
8 │ intimates that the process by which citizens may register to vote
9 │ in California or by which they are selected for jury service in
10 │ this district is susceptible of abuse or is not racially neutral.
11 │ As discussed above, the jury selection method used in this
12 │ district is that which is prescribed by the JSSA and permissible
13 │ under 18 U.S.C. § 1863(b)(2).  Accordingly, Luong has failed to
14 │ establish a prima facie equal protection violation.

15 │       IT IS THEREFORE ORDERED that defendant John That
16 │ Luong's motion to dismiss the indictment or stay proceedings on
17 │ the grounds that the racial composition of the jury wheel from
18 │ which his trial jury is to be selected violates the Jury
19 │ Selection and Service Act of 1968 and the Equal Protection Clause
20 │ be, and the same hereby is, DENIED.

21 │ DATED: February 13, 2003

22 │

23 │                WILLIAM B. SHUBB
                UNITED STATES DISTRICT JUDGE

24 │
25 │
26 │
27 │
28 │

13

United States District Court
for the
Eastern District of California
February 13, 2003


* * CERTIFICATE OF SERVICE * *


2:99-cr-00433


USA

   v.

Luong

_____


I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  February 13, 2003, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


William Sze Wong                                  SH/WBS
United States Attorney
501 I Street                                      P. Sandlin
Suite 10-100
Sacramento, CA  95814

Patrick Hanly
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814

Richard B Mazer
Law Offices of Richard B Mazer
99 Divisadero Street
San Francisco, CA  94117

Jan David Karowsky
716 19th Street
Suite 100
Sacramento, CA  95814-0710

Gail R Shifman
Law Offices of Gail Shifman
632 Commercial Street
Second Floor

San Francisco, CA  94111
Shari G Rusk
Law Offices of Shari Rusk
1710 Broadway
Suite 111
Sacramento, CA  95818

Jeffrey L Staniels
Federal Defender
801 K Street
Suite 1024
Sacramento, CA  95814

Michael Bradley Bigelow
Law Offices of Michael Bradley Bigelow
428 J Street
Suite 358
Sacramento, CA  95814-6908

James Ralph Greiner
Law Offices of James R Greiner
555 University Avenue
Suite 290
Sacramento, CA  95825

George C Boisseau
Law Offices of George C Boisseau
50 Santa Rosa Avenue
Fifth Floor
Santa Rosa, CA  95404


SERVICE BY INTER OFFICE:

 US MARSHAL      PROBATION      PRETRIAL  SERVICES


                              Jack L. Wagner, Clerk

                         BY: _____
                              Deputy Clerk